***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission affirms with minor modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. On 29 April 1998, the date of plaintiff's alleged injury, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On that date, an employment relationship existed between plaintiff and defendant-employer.
3. A set of plaintiff's medical records consisting of thirty-eight pages, marked as Stipulated Exhibit Number Two, is admitted into evidence.
4. Industrial Commission Forms 18, 19, 61, 33, 33R and an order filed 15 February 1999, collectively marked as Stipulated Exhibit Number Three, are admitted into evidence.
5. A set of documents including plaintiff's employment and wage records from defendant-employer and correspondence from defendant-employer, collectively marked as Stipulated Exhibit Number Four, is admitted into evidence.
6. Six letters from defendant-insurer to plaintiff, plaintiff's counsel and Dr. Meyerdierks, collectively marked as Stipulated Exhibit Number Five, are admitted into evidence.
7. A surveillance videotape, marked as Stipulated Exhibit Number Six, is admitted into evidence.
 ***********
Based upon all of the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was forty-seven years old. Plaintiff graduated from high school. She later became a certified nursing assistant and a certified respiratory therapist. Plaintiff's employment history included work as a certified nursing assistant and respiratory therapist. Prior to March 1998, plaintiff had no clerical work experience.
2. In March 1998, plaintiff became aware of a job opening advertised by Pharmagraphics in a classified advertisement. Plaintiff applied for the position and was granted an interview with Patsy Perkins, Pharmagraphics' human resources manager. During the interview, Ms. Perkins informed plaintiff that she would be hired as a machine operator/medical insert inspector and should go to defendant-employer's place of business to complete an employment application. Plaintiff followed Ms. Perkins' instructions and began working for defendant-employer on 30 March 1998 at her assignment for Pharmagraphics. Plaintiff did not understand that she was an employee of defendant-employer, assigned to work for Pharmagraphics. Plaintiff believed that she was an employee of Pharmagraphics and that defendant-employer's only role in her employment was to process her payroll checks.
3. Plaintiff was assigned to work at Pharmagraphics eight hours per day, forty hours per week. Her rate of pay was $6.50 per hour. The duties of plaintiff's position included off-loading and boxing of printed inserts from a printing machine, inspection of inserts for proper gluing and cutting and periodic cleaning of her work area and the printing machine using an air hose.
4. Plaintiff is right hand dominant. Prior to her employment with defendant-employer she had experienced no physical difficulties with her upper right extremity. At some time prior to beginning her employment she had fractured her wrist, but that condition resolved and did not impair plaintiff as of March 1998.
5. On 29 April 1998, plaintiff was performing her usual duties as a machine operator, using an air hose to clean her work area and the printing machine. While using the air hose, plaintiff struck her right elbow against the machine. When she struck her elbow, plaintiff experienced a sensation similar to striking her "funny bone".
6. Plaintiff reported this incident to two co-workers, but continued working as usual for several days following the incident. During this time, her right elbow became progressively swollen, discolored and painful. Plaintiff reported this incident to defendant-employer within 30 days of its occurrence. When plaintiff reported this incident to defendant-employer, Dawn Brown instructed plaintiff to seek medical treatment from Urgent Care. Defendant-employer employed Ms. Brown as a branch manager. Plaintiff did not seek medical treatment as recommended by Ms. Brown. Rather, she continued working at her assignment for Pharmagraphics due to her concern that absences from work while seeking medical treatment might cause the termination of her employment.
7. Plaintiff was scheduled to work overtime on Saturday, 9 May 1998. Plaintiff did not work on that date due to right upper extremity pain. She did leave a voice message at defendant-employer's place of business stating that she would be absent from work on that date due to right arm symptoms. Due to her absence from work on that date, Pharmagraphics terminated plaintiff's work assignment. Defendant-employer did not terminate plaintiff's employment on that date. Plaintiff last worked at Pharmagraphics on 8 May 1998.
8. On 10 May 1998, plaintiff presented to the emergency department of Forsyth Memorial Hospital for treatment of right upper extremity symptoms related to the incident on 29 April 1998. The emergency department physician restricted plaintiff from using her right arm for one week and directed her to seek follow-up treatment from an orthopedist, Dr. Tomberlin. Plaintiff also received a prescription for Vicodin. This medication caused plaintiff to become "groggy". Plaintiff obtained an appointment for an evaluation by Dr. Tomberlin on 17 May 1998. Plaintiff did not attend the evaluation because her grandmother died and was buried on 17 May 1998.
9. On 1 June 1998, plaintiff returned to the emergency department of Forsyth Memorial Hospital. Following an examination, plaintiff was referred to a PrimeCare facility. The PrimeCare physician who examined plaintiff prescribed medications and referred her to a neurologist, Dr. Crowell.
10. On 1 June 1998, defendant-insurer prepared an Industrial Commission Form 61, denying plaintiff's workers' compensation claim pursuant to N.C. Gen. Stat. § 97-18(c) and (d). On that form, defendant-insurer stated "The claim is denied due to the employee's noncompliance with our investigation." On 3 June 1998, plaintiff gave a recorded statement to defendant-insurer describing the incident on 29 April 1998 and the medical treatment she received since that date. By letter dated 10 June 1998, defendant-insurer informed plaintiff that it was denying her claim for workers' compensation "due to your noncompliance with our investigation." Despite having obtained plaintiff's recorded statement, on or about 31 July 1998, defendant-insurer filed its Industrial Commission Form 61 in the Industrial Commission, informing plaintiff and the Industrial Commission that it was denying plaintiff's claim for workers compensation "due to the employee's noncompliance with our investigation."
11. Prior to 3 June 1998, defendants did not offer plaintiff employment in any position. On 3 June 1998, defendant-insurer telephoned Dawn Brown and instructed her to offer plaintiff a modified position working in defendant's office. Defendant-employer regularly employed only two persons in its office. One of those employees worked only part-time. In response to defendant-insurer's directive, Ms. Brown wrote plaintiff a letter on 4 June 1998 by which she offered plaintiff employment in a "temporary position" that "takes into account your modified work status that resulted from your injury on April 29, 1998. This job will be at Western Staff Services." Ms. Brown stated that the physical requirements of the position have been approved by plaintiff's treating physician. However, neither Ms. Brown nor any other representative of defendants had provided any physician with a description of the temporary, modified position. Likewise, the evidence of record is insufficient to prove by its greater weight that defendants offered plaintiff any description of the nature or actual duties of the temporary, modified position. Plaintiff's employment in the modified, temporary position was to begin on 8 June 1998.
12. On 4 June 1998, plaintiff presented to Dr. Crowell who recommended that plaintiff receive nerve conduction studies and physical therapy. Thereafter, Dr. Crowell excused plaintiff from work from 3 June 1998 through 15 July 1998.
13. Although plaintiff's employment in the temporary, modified position was to begin on 8 June 1998, defendant-employer wrote a letter to plaintiff dated 5 June 1998 stating, "On June 5, 1998, Western contacted you with a job offer that met the physical limitations of you [sic] work related injury. Since you have refused the job and did not appear at the job site, we assume that you have chosen to terminate your employment with Western." Despite the content of these two letters, Ms. Brown again wrote to plaintiff on 18 June 1998. In this letter, Ms. Brown stated, "This letter is to state that on June 17, 1998, Anthony Martin of Travelers Insurance Co. called and offered you modified duty thru [sic] our company. Due to the fact that you accepted the assignment and failed to call or appear, we regret that we will no longer be able to offer you other assignments."
14. On 18 June 1998, Anthony Martin, a claim representative employed by defendant-insurer, wrote a letter to plaintiff stating, in part, "This will follow our telephone conversation of June 17, 1998. Under the N.C. Workers Compensation Act, we are allowed to direct your medical treatment once we accept compensability for your claim. Since that has been cleared up, we are going to order Dr. Crowell's records for our file and allow you to have nerve conduction studies under Dr. Crowell." In this letter, Mr. Martin further stated, "Since your were released by PrimeCare to go back to work with restrictions and work meeting the restrictions was offered to you, you did have a responsibility to return to work doing this modified duty. Since your employer did provide work meeting the doctor's restrictions, you are not eligible for disability benefits under Workers Compensation." Defendants did not provide the Industrial Commission with a copy of this letter.
15. On 21 July 1998, Mr. Martin wrote to plaintiff's counsel stating, in part, that plaintiff "did have a compensable event with a right elbow contusion. However, further medical investigation needs to take place to determine if her current symptoms are indeed related to this contusion." In this letter, Mr. Martin described the temporary, modified work offered to plaintiff as being work requiring the use of only one arm. Mr. Martin provided a copy of this letter to the Industrial Commission. This letter did not constitute an admission of defendants' liability for plaintiff's continuing medical treatment. Likewise, this letter did not conform to the requirements of N.C. Gen. Stat. § 97-18(b). Nevertheless, on or about 31 July 1998, defendants filed an Industrial Commission Form 61, formally denying plaintiff's claim under the North Carolina Workers' Compensation Act "due to the employee's noncompliance with our investigation." Defendants filed this form more than fourteen days after defendants had actual notice of plaintiff's claim. When defendants filed their Response to Request that Claim be Assigned for Hearing, defendants stated that "compensability as to medicals has been admitted." However, defendants did not thereafter formally admit liability for plaintiff's 29 April 1998 injury until this claim was set for hearing before Deputy Commissioner Stephenson on 11 February 1999. At that time, defendants through counsel admitted to the deputy commissioner that plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer on 29 April 1998 and that defendants were liable for medical compensation for treatment of that injury.
16. Considering plaintiff's physical restrictions, her excuse from work by Dr. Crowell, and the vague description of the temporary, modified position in defendant-employer's office, plaintiff's non-acceptance of defendants' offer of employment in a temporary, modified position was reasonable. Even considering the offered employment as transitional or rehabilitative in nature, defendants did not accept liability for plaintiff's injury. Having denied plaintiff's claim, defendants did not obtain the right to direct medical or rehabilitative treatment.
17. Following an evaluation on 19 June 1998, Dr. Crowell referred plaintiff to Dr. O'Keefe, an orthopedist. Dr. Crowell did not evaluate or treat plaintiff after 18 June 1998.
18. Plaintiff first presented to Dr. O'Keefe on 30 September 1998. On that date, plaintiff was experiencing tenderness over her right lateral epicondylar region. She had a full range of motion. She had no effusion. She had diffuse areas of decreased sensation. These symptoms, which she had experienced since 29 April 1998, were caused by lateral epicondylitis. Plaintiff's lateral epicondylitis was caused by the incident on 29 April 1998.
19. Dr. O'Keefe treated plaintiff with an injection of Lidocaine and Celestone. He prescribed physical therapy and anti-inflammatory medication. He restricted plaintiff from any use of her right arm pending a follow-up evaluation in two months. Defendant-insurer authorized Dr. O'Keefe's treatment of plaintiff, except that Dr. O'Keefe was required to obtain pre-authorization for diagnostic testing. When plaintiff returned to Dr. O'Keefe on 4 November 1998, her symptoms persisted. Again she was treated with an injection and received a prescription for anti-inflammatory medication.
20. At defendant-insurer's direction, plaintiff presented to Dr. Meyerdierks for evaluation on 28 July 1998. On physical examination, plaintiff exhibited symptoms that were positive for lateral epicondylitis and ulnar nerve compression. Plaintiff did not exhibit signs of symptom magnification. Dr. Meyerdierks did not evaluate plaintiff on any other occasion.
21. The injections plaintiff received from Dr. O'Keefe did not provide her with significant relief of her symptoms. However, those treatments were reasonably necessary to treat her lateral epicondylitis. Plaintiff did not attend the prescribed physical therapy session due to fear that the activities associated with therapy would exacerbate her pain. The pain associated with medial epicondylitis may be exacerbated by activities associated with physical therapy. Plaintiff's failure to participate in physical therapy was reasonable.
22. When the conservative treatment provided by Dr. O'Keefe failed to provide relief, he recommended that plaintiff undergo epicondylar release surgery. On 12 January 1999, defendants informed Dr. O'Keefe that surgical treatment was not authorized and that they intended to seek another medical opinion regarding the necessity of surgical treatment.
23. On 21 January 1999, plaintiff presented to Dr. Burrows upon referral by defendants for evaluation of her right upper extremity condition. As of that date, she was capable of lifting two to three pounds on a frequent basis and seven to ten pounds on an occasional basis. She was not capable of repetitive work, work requiring forceful wrist action or forceful pushing or pulling. Plaintiff was not capable of extensive writing and was limited to short notes or messages. Based upon his belief that plaintiff had received only one injection, Dr. Burrows concluded that surgical treatment was not warranted at that time. However, he recommended that she receive an epicondylar release if she received no relief after receiving a sufficient number of injections.
24. Upon referral by defendants, plaintiff presented to Dr. Gioffre on 5 April 1999 for an independent medical evaluation. Dr. Gioffre recommended that plaintiff undergo surgical treatment for lateral epicondylitis if appropriate conservative treatment had failed to relieve her right upper extremity symptoms. A series of two injections is an adequate number of injections to determine with reasonable certainty whether conservative treatment of lateral epicondylitis will be effective.
25. As of the date of the hearing before the Deputy Commissioner, plaintiff's right upper extremity symptoms persisted despite numerous evaluations, examinations and adequate conservative treatment. Plaintiff will benefit from epicondylar release surgery.
26. There is no evidence of record that plaintiff sought employment after 8 May 1998. However, from 10 May 1998 through the date of the hearing, plaintiff's physicians excused her from work or imposed restrictions that severely limited the duties she was capable of performing. Considering plaintiff's age, education, work experience, work restrictions and work excuses, any effort to obtain employment after 8 May 1998 would have been futile.
27. From 9 May 1998 through the date of the hearing before the Deputy Commissioner, plaintiff was incapable of earning wages from defendant-employer or any other employer as a result of her right lateral epicondylitis.
28. Plaintiff worked for defendant-employer for fewer than fifty-two weeks. Due to the shortness of time defendant-employer employed plaintiff, dividing her wages by the number of weeks or parts thereof during which she earned wages does not produce a result that is fair and just to both parties. An employee of a similar grade and character employed by defendant-employer during the fifty-two week period preceding 29 April 1998 would have earned an average weekly wage of $260.00. Thus, plaintiff's average weekly wage was $260.00.
29. Defendants' defense of plaintiff's claim was not based in stubborn unfounded litigiousness.
 ***********
The foregoing findings of fact and conclusions of law engender the following additional
 CONCLUSIONS OF LAW
1. On 29 April 1998, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. Defendants' failure to admit or deny the compensability of plaintiff's injury within 14 days of the date they received actual notice of her claim does not bar defendants from defending plaintiff's claim. N.C. Gen. Stat. § 97-18.
3. Defendants, having failed to admit liability for plaintiff's claim, did not obtain the right to direct plaintiff's medical treatment. N.C. Gen. Stat. § 97-25.
4. As a result of her injury on 29 April 1998, plaintiff is entitled to payment of total disability compensation at the rate of $173.34 per week from 9 May 1998 and continuing until order of the Industrial Commission allowing cessation of temporary total disability compensation. N.C. Gen. Stat. § 97-29.
5. Plaintiff is entitled to payment of all medical expenses incurred for treatment of her right upper extremity, including all treatment prescribed by Dr. O'Keefe, specifically including epicondylar release surgery. N.C. Gen. Stat. § 97-25.1.
6. Plaintiff is not entitled to an award of attorney's fee and costs. N.C. Gen. Stat. § 97-88.1.
7. Plaintiff is entitled to payment by defendants of attorney's fees in the amount of $750.00 representing the reasonable costs of defending the appeal of the Deputy Commissioner's decision. N.C. Gen. Stat. §97-88.
8. Plaintiff is entitled to have defendants pay interest at the statutory rate of 8% on the unpaid portions of the final award of the Deputy Commissioner beginning on 11 August 1999, and continuing until paid in full. N.C. Gen. Stat. § 97-86.2.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay plaintiff temporary total disability compensation at the rate of $173.34 per week from 9 May 1998 and continuing until order of the Industrial Commission allowing cessation of temporary total disability compensation. To the extent that this amount has accrued, it shall be paid in a lump sum, subject to the attorney's fee approved in paragraph 3.
2. Defendants shall pay all medical expenses incurred by plaintiff for treatment of her right upper extremity, including all treatment prescribed by Dr. O'Keefe, specifically including epicondylar release surgery.
3. A reasonable attorney's fee of twenty-five percent of the compensation due plaintiff is approved for plaintiff's attorney and shall be paid as follows: twenty-five percent of the lump sum due plaintiff in paragraph 1 shall be deducted from that amount and paid directly to plaintiff's attorney. Thereafter, plaintiff's attorney shall receive as an attorney's fee every fourth compensation check due plaintiff.
4. Defendants shall pay the amount of $750.00 to plaintiff's counsel for attorney's fees incurred in the defense of defendants' appeal to the Full Commission.
5. Defendants shall pay plaintiff interest at the rate of 8% on the unpaid portions of the final award of the Deputy Commissioner beginning on 11 August 1999 and continuing until paid in full. This award shall not be part of, or in any way increase plaintiff's attorney's fees, but shall be paid directly to plaintiff.
6. Defendants shall pay the costs of this action.
This the ___ day of November, 2000.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/______________ RENE C. RIGGSBEE COMMISSIONER